## First National Bank of Mahanoy City, Plff. in Err., *v.* Edward Gorman.

Evidence of matter of a defense to a judgment, offered in opposition to a scire facias to revive it (here to prove that plaintiff had realized upon collaterals with notice that they were held subject to a pledge to defendant), ought to be very full and clear. Testimony produced to show that a bank, in selling and buying in pledged bonds, took them with notice of the defendant's claim to them, reviewed and held insufficient.

(Decided October 5, 1885.)

Error to the Court of Common Pleas of Schuylkill county, to review a judgment for defendant, on a scire facias to revive a judgment. Reversed.

The scire facias was brought by the First National Bank of Mahanoy City against Edward Gorman. The defendant pleaded payment of the judgment sought to be revived. Upon the trial the following facts appeared. In 1875, the firm of Lee & Wren procured the First National Bank of Mahanoy City to

discount commercial paper of the Bechtelville Iron Company, pledging, as collateral security therefor, first-mortgage bonds of the Bechtelville company. Subsequently the bank discounted a note of Ralph R. Lee, a member of the firm of Lee & Wren, indorsed by Edward Gorman. This note was once renewed, but having been subsequently protested for nonpayment, Gorman confessed to the bank a judgment for its amount, which was duly recorded and is the judgment sought to be revived in this action.

The debt for which the Bechtelville company's bonds had been pledged not having been paid, the bank sold the bonds at public auction, and itself became the purchaser. It was contended by the defendant that these bonds had been pledged to him for the payment of the note on which he was indorser; that the bank had notice of such pledging and that the money realized by the sale of the bonds canceled his indebtedness to the bank. The jury found for the defendant, and the bank brought error.

*T. H. B. Lyon* and *Hughes & Farquhar* for plaintiff in error.

*James B. Reilly* and *John W. Ryon* for defendant in error.

OPINION BY MR. JUSTICE GREEN:

The rights of the plaintiff as pledgee of the Bechtelville bonds accrued in 1875, when the bonds were first pledged as collateral to the notes of the Bechtelville Iron Co., given to Lee & Wren, for whom they were discounted by the plaintiff. The bonds were never deposited as collateral to the Gorman note. That note had no existence till in April, 1876. It is entirely undisputed that the bank never agreed to hold the bonds as collateral to the Gorman note; on the contrary they declined to do so when requested. In the fall of 1876, the bank gave notice to Lee & Wren to pay off the notes and redeem the bonds. This they failed to do, and, shortly after, the bank, after giving notice to Lee & Wren, sold the bonds at public sale in Philadelphia, and bought them at eighty-five cents on a dollar, that being the highest price bid for them. After this sale, the bank obtained from the defendant Gorman, a confession of judgment for $1,500, being part of the note indorsed by him for Lee & Wren, the remainder due on the note being paid by him

in cash.  At different times afterwards, from February, 1877, to May, 1881, the defendant paid to the plaintiff sums amounting in the aggregate to $360, all on account of the judgment. The present proceeding is a scire facias to revive the judgment, and the defense set up is that the plaintiff was a pledgee of the Bechtelville bonds for the protection of the note orignally indorsed by the defendant.  The case was left to the jury, solely upon the question whether the plaintiff had notice of the right of Gorman to look to the bonds as a security for the note.

The learned judge of the court below, in a very fine and able charge, instructed the jury that the bonds were not originally deposited as collateral to the Gorman note, and that, at the time the note was discounted, nothing was said to the bank about holding the bonds as collateral to it.  He also said that if any notice was given to the bank on this subject, it must have been after the note was discounted and before the settlement between Lee & Wren, and the bank, which took place in 1878, and that the only testimony in connection with the matter was that of Lee & Wren, and he summed up the matter finally by saying to the jury:  "It is a question for you whether their testimony amounts to sufficient to show that they had given notice to the bank that Gorman had such a right to look to the bonds as security for this Gorman note."  After referring to the testimony of Lee & Wren, and explaining to the jury that the mere expression by Lee & Wren of their desire that the bank should allow enough for the bonds to cover the Gorman note would not be sufficient to show a notice to the bank that Gorman had an agreement with Lee & Wren by which he acquired a right to look to the bonds as collateral, he said:  "You must be satisfied, under the evidence in the case, that in the negotiations between Lee & Wren and the bank, either Lee or Wren did notify the bank that there was such an agreement between themselves and Gorman, by which Gorman had a right to look to the bonds as a collateral security."

While we do not quite understand how the bank could be affected by any agreement made between Gorman and Lee & Wren after its rights had attached, yet, if such were the case and there had been testimony sufficient to justify a verdict for the defendant, no fault could be found with the manner in which the question of notice to the bank was committed to the jury.  But just here we think there was error in the action

of the learned court below. A very careful study of the testimony fails to disclose any evidence sufficient to authorize the jury to find that there was any notice to the bank of any agreement between Gorman and Lee & Wren that these bonds were to be held as collateral to the Gorman note.

Gorman was himself examined as a witness, and he nowhere alleges that such an agreement was ever made. The utmost that he said on that subject was in his answers to the following questions:

*Q.* If you became an indorser of one of their notes in 1876, just state the circumstances under which you came to do so?

*A.* Mr. Lee came down to my place where I was working and asked me to do it. He told me on the way up to the bank that there was plenty of security in the bank to redeem it and any other paper he might have there. The note was made in the bank, signed in the bank.

*Q.* You indorsed the note in the bank.

*A.* Yes sir.

*Q.* In the presence of any of the officers of the bank?

*A.* In the presence of Yoder, the cashier.

It will be seen at once that nothing was said about these particular bonds; no promise was made or exacted that the securities that were there should be held as collateral to this note; no condition or stipulation of any kind was demanded or even proposed, by Gorman, as the basis upon which he would indorse the note; no agreement was made that the securities then in the bank should be kept there, or that Lee & Wren should abstain from increasing their indebtedness, or from specifically pledging the securities for other debts, or from taking them up whenever they pleased. So far as Gorman's testimony goes, his indorsement was absolute and unconditional, and simply preceded by a remark, made by Lee, that at that time there were securities at the bank sufficient to redeem any paper he might have there.

Nor does the testimony of Lee or Wren present the subject in any materially different light. Lee was asked:

*Q.* State whether or not you and Mr. Wren did not both claim, during the progress of this settlement, that those bonds were security for the Gorman paper as well as the other?

*A.* We stated so to the bank, that we wished them to be.

*Q.* And insisted that they should be so treated in the settlement that was made with you?

*A.* We told them we would like to have them included in the settlement, that note.

*Q.* You stated to the bank that you wished the bonds to be considered as security for the Gorman paper. When did you state that to the bank?

*A.* That was at the time we were dealing backward and forward about it for a settlement.

It is manifest that this language, instead of being notice to the bank that Lee & Wren had agreed with Gorman at the time of his indorsement that the bonds were to be held as collateral to that note, was merely the expression of their wish at a long subsequent time, that the bank should so hold them. The witness states elsewhere that the bank declined to do so.

Immediately after the foregoing testimony the same witness testified that the bonds were not placed as collateral for the indebtedness of Lee & Wren, but for the Bechtelville paper only at first, and this statement was repeated many times, both by Lee and Wren, in the course of their testimony. Wren testified:

*Q.* Was there any agreement between you and the bank, that is, between your firm and the bank, that these bonds should be held as security for any other paper than the Bechtelville paper?

*A.* No, sir, not as I remember.

*Q.* Anything said on that subject?

*A.* No, sir, not that I remember.

He also testified:

*Q.* The only time you talked to the bank about including the Gorman note was when you came to make this final settlement?

*A.* Yes, sir, after we got the second bonds.

Also:

State whether you did not communicate to them that you had told Gorman that these collaterals in the bank were sufficient.

to secure him at the time he indorsed the note, before they made this application.

*A.* I do not remember that I said that to them, but they paid 75 for the bonds, and we expected to get at least 75 for them; then we could have paid for them.

*Q.* Do you remember whether it was stated to them, either by you or Lee during your negotiations or attempt to settle, that such an arrangement had been made with Gorman, and that you wanted him to have the benefit of this security.

*A.* We might have said we calculated we had collateral there to pay for all the paper we had; we did not calculate those bonds to remain there at all.

Much other testimony was given by these two witnesses, the purport of which was that they were very anxious to have the Gorman paper included in the final settlement, and tried every means with the bank to induce them to allow a price for the bonds which would cover it; but the bank positively refused to do it and held on to the paper. They were pressed with many questions by defendant's counsel, who called them to the stand with the object of getting from them a distinct statement that they had notified the bank that they had agreed with Gorman to hold these bonds as collateral to his indorsement, but in no instance did either of them make a precise statement to that effect. We are referred to the following testimony as sufficient to sustain the verdict. Lee, being examined, was asked:

*Q.* Before this appropriation was made, of the proceeds of those bonds, to this paper which you settled, did you inform the bank officers that you had told Gorman, or arranged with Gorman, that he should have the benefit of any collaterals you had there?

*A.* Yes; I think we did at the time of this settlement.

*Q.* Before they made the appropriation?

*A.* We told them in a conversation that we wanted to protect Gorman in this paper and wanted to have that included in.

The second answer explains the first, and proves that the witness was referring entirely to the conversation previously stated by him, in which he expressed a desire that the Gorman paper should be protected. He was next asked:

*Q.* You told Gorman that there were collaterals there that he should have the benefit of?

*A.* Yes, sir.

*Q.* They refused then to agree to that, to allow it to go on the Gorman paper?

*A.* Yes, sir; they considered Gorman good enough outside of that.

Whether the witness had originally told Gorman this, or not, was not material, unless it took the form of an agreement, upon faith of which the indorsement was made, and unless, also, the fact of such agreement was communicated to the bank in a distinct and definite manner, and this the witness does not state.

A further question was put which is offered as material, thus:

*Q.* Then, notwithstanding you communicated to them that you had agreed with Gorman or told him he should have the benefit of collaterals, that you had enough then to make him secure, they refused to make the application of this overplus to the Gorman paper, but applied it to paper they held against you that was utterly worthless?

*A.* That was it. They picked out all the bad paper and gave us credit for; and the good they held the other parties for.

It is impossible to regard this answer as being any evidence whatever to prove that the witness had communicated to the bank any agreement with Gorman in regard to the collaterals. The interrogative part of the question has no relation to that subject, and the answer proves that the witness was describing the action of the bank in selecting the paper, and not what he said in making a communication to the bank. The assumption contained in the question by way of recital was not warranted by the previous testimony, and was neither repeated nor verified by the words of the answer.

It seems unnecessary to prosecute further the review of the testimony. The witnesses were afforded the opportunity of saying directly and distinctly whether they had notified the bank of any agreement with Gorman respecting these particular collaterals, and they did not say it. In such circumstances it would not be proper to impute such a meaning to them, by interpretation of other answers to other questions relating to other sub-

jects.  Especially is this the case in view of the fact that the defendant himself made no pretense in his testimony of the existence of any such agreement; made no claim to the bank that he was entitled to the protection of these bonds as collaterals; gave no notice of any rights or equities as a pledgeor; confessed judgment to the bank for the largest part of the note he had indorsed, after paying the remainder, and after the bank had sold the bonds as pledgee; and then made repeated payments, on account of the judgment, during several years succeeding its confession.

The evidence supporting such a defense as this, where the proceeding is a scire facias to revive the judgment, ought to be very plain and clear indeed.  We find it to be quite otherwise, and entirely insufficient to sustain a verdict against the judgment.  We are of opinion that there was not sufficient evidence to warrant the submission of the question of notice to the jury, and that they should have been instructed to render a verdict for the plaintiff.  The assignments are all sustained.

Judgment reversed and *venire de novo* awarded.